COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JIMMIE McMORRIS, | § | No. 08-11-00171-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 371st Judicial District Court |
| THE STATE OF TEXAS, | § | of Tarrant County, Texas |
| Appellee. | § | (TC# 1177999D) |
| | § | |

## **O P I N I O N**

Appellant Jimmie McMorris ("McMorris") appeals his conviction of two counts of sexual assault, for which he was sentenced to seven years' confinement. In three issues, McMorris argues that the trial court abused its discretion: (1) by allowing the State to present, during rebuttal, evidence of alleged extraneous offenses in violation of Rule 404(b); (2) by delivering a supplemental jury instruction that he contends coerced a verdict and by denying his Motion for Mistrial related to the supplemental instruction; and (3) by denying his Motion for New Trial. We affirm.[1]

## **BACKGROUND**

McMorris owned and operated a cleaning business, JMAC Corp. Services, Inc. ("JMAC"). American Eurocoptor contracted with JMAC to provide cleaning services at its Grand Prairie, Texas, location.

---

[1] This case was transferred from the Second Court of Appeals to this Court pursuant to a docket equalization order entered by the Texas Supreme Court. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2005). We have applied precedent of the Fort Worth Court of Appeals. *See* TEX.R.APP.P. 41.3.

The complainant, Maria Rodriguez ("Rodriguez"), entered the United States illegally in September of 2001. In October or November of 2008, she began working for JMAC under the name Norma Alvarez as part of the American Eurocoptor cleaning crew. As time passed, Rodriguez and McMorris began to have more contact with each other, while McMorris was supervising her work. McMorris contends that Rodriguez developed a crush on him. Rodriguez testified that McMorris acted in ways that made her feel uncomfortable, including caressing her hair and offering her money, and on one occasion saying "please, please" and pointing at her body. While these situations made Rodriquez feel uncomfortable, she never made a complaint against McMorris because she did not think he would do anything to her at work. Rodriguez thought about leaving her job, but since her husband was unemployed she stayed.

According to McMorris, on the afternoon of September 23, 2009, he was at the Arlington Park Apartments to purchase some food, an African dish called "can can," from some of his wife's friends who make and sell the dish out of their apartment. McMorris knew that Rodriguez lived at the Arlington Park Apartments and as he was leaving, he saw Rodriguez.

They gestured towards each other, and Rodriguez followed McMorris in her vehicle to a parking spot that was hidden by some trees. McMorris testified that Rodriguez got into his vehicle, where they engaged in consensual sex.

Rodriguez testified that on September 23, 2009, she went to work around 5 p.m. and signed in at the guard shack. The usual procedure was that a security guard would accompany her when she cleaned the presidential suite offices and accounting area, but after she was finished in those areas there was no guard accompanying her.

While Rodriguez was cleaning the unsecured office area, McMorris exited the kitchen area

2

and asked her for a trash bag. After he placed the bag in a trash can, he called Rodriguez to the restroom. In the restroom, McMorris pointed to the soap, and Rodriguez told him that she had not yet cleaned the area. At approximately 9:15 p.m., when McMorris and Rodriguez were about to leave the restroom, McMorris blocked the doorway. Rodriguez testified that McMorris grabbed her by the arms, pulled her towards him, and told her to kiss him. Frightened, Rodriguez told him "no;" at which point McMorris pulled down her blouse and grabbed and kissed one of her breasts. Rodriguez kept saying "no," while McMorris would say "yes." McMorris then put his hands down Rodriguez's pants and inserted his fingers into her vagina while she tried to back away.

McMorris then took Rodriguez by the hand, pushed her into a restroom stall and closed the door. Rodriguez testified that McMorris grabbed her hand, turned her around, pulled down her clothing, then inserted his penis into her vagina for four or five minutes and ejaculated. He then said "thank you" and left.

Rodriguez testified that after McMorris left she felt lost and dazed. She remained in the restroom, cleaned herself and cried. When she left the restroom she ran into a co-worker. Feeling ashamed, she did not tell the co-worker what happened, but did tell him that she was not going to clean anymore that night, and the co-worker went with her to drop off her cart and take out the trash.

On her way out, Rodriguez saw another co-worker, Justina Grimaldo. Rodriguez told Grimaldo that McMorris "had taken her by force, had abused her, and had raped her," in one of the restrooms. Grimaldo told Rodriguez to make a report but Rodriguez did not do so because she was afraid her husband would leave her and because she was using false documents to remain in the United States.

3

Rodriguez went home after talking to Grimaldo. Rodriguez bathed and lay down on the living room sofa, but could not go to sleep. She testified that she was in pain from what McMorris had done to her. The next day, Rodriguez had intercourse with her husband. Throughout the day she was anxious, but when her husband asked what was wrong and why she was crying, Rodriguez told him it was nothing.

When Rodriguez went to work the next evening, she told co-worker Jessica Hinojosa that McMorris had sexually assaulted her in the restroom and that she had been unable to defend herself. Hinojosa told Rodriguez that they should contact the police, but Rodriguez was afraid and did not want to tell her husband what had happened. Rodriguez left work after telling Grimaldo she no longer felt comfortable being there and would not return. Rodriguez returned home and told her husband she would not be going back to work. When he insisted on the reason, Rodriguez began crying and told him that McMorris had sexually assaulted her. Her husband told her that she needed to go to the police, and she agreed.

Meanwhile, Grimaldo told an American Eurocoptor employee that McMorris raped Rodriguez at work the night before. The employee informed a security guard, who then called the police. Grimaldo called Rodriguez and convinced her to return to American Eurocoptor to talk to the police. Rodriguez returned and told a Grand Prairie police officer what happened. After Rodriguez made her statement, McMorris was issued a criminal trespass warning and escorted from the premises. A police officer accompanied Rodriguez to her house where she gave the officer two pairs of underwear, one of which she wore the day McMorris assaulted her. Rodriguez then went to the hospital for a sexual assault examination. DNA testing on the underwear concluded that neither McMorris nor Rodriguez's husband could be excluded as

4

possible contributors of the male DNA from two different individuals.

McMorris was indicted on two counts of sexual assault. Following a six-day trial, the jury found McMorris guilty of both counts. He was sentenced to seven years confinement in the Institutional Division of the Texas Department of Criminal Justice. McMorris timely appealed.

Following the trial and after McMorris filed his notice of appeal, juror C.F. sent a letter to the court, informing the court that during deliberations, another juror revealed that she had been the victim of a sexual assault, but had chosen not to disclose this during voir dire. The juror allegedly told "the entire story" of how she had been assaulted. McMorris filed a Motion for New Trial based on this allegation. At the hearing on the Motion for New Trial, juror C.F., who provided the letter and an affidavit, was unable to appear due to a family emergency. The affidavit and letter were entered into evidence without objection. No other evidence was offered by either party. The State argued, *inter alia*, that the affidavit was insufficient pursuant to Rule 606(b) of the Texas Rules of Evidence. The trial court denied the motion, noting that the State's reliance on Rule 606 was "well founded;" there was no clear evidence about which juror may have made the statements; the question presented in voir dire was "somewhat vague as to whether a person themselves is sexually assaulted," and that a more specific question could have been asked; and under case law cited by the State, the defense did not exercise due diligence in asking the questions it specifically wanted answered during voir dire.

## DISCUSSION

In three issues, McMorris argues that the trial court abused its discretion: (1) by allowing the State to present, during rebuttal, evidence of alleged extraneous offenses in violation of Rule 404(b); (2) by delivering a supplemental jury instruction that he contends coerced a verdict and by

5

denying his Motion for Mistrial related to the supplemental instruction; and (3) by denying his Motion for New Trial.

**Extraneous Offenses**

McMorris first contends that the trial court abused its discretion by allowing the State to present evidence of extraneous offenses, in violation of Texas Rule of Evidence 404(b), during rebuttal.   Specifically, McMorris argues that the court erred when it permitted the State to present evidence from Araceli Luna ("Luna").   The State counters that the testimony was admissible to rebut a defensive theory, to rebut statements made by McMorris, and even if there was error, it must be disregarded because it did not have a substantial or injurious effect on the jury's verdict.

We will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex.Crim.App. 2007).   As long as the trial court's decision is within the "zone of reasonable disagreement" and was correct under any theory of law applicable to the case, the decision must be upheld.   *Id.*

Rule 404(b) of the Texas Rules of Evidence provides that evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith."   TEX.R.EVID. 404(b).   However, such evidence may be admissible for other purposes, and rebuttal of a defensive theory is one of the permissible purposes under Rule 404(b).   *Williams v. State*, 301 S.W.3d 675, 687 (Tex.Crim.App. 2009).   By raising a defensive theory, a defendant opens the door for the State to offer rebuttal testimony regarding an extraneous offense if the extraneous offense has common characteristics with the offense for which the defendant is on trial.   *Richardson v. State*, 328 S.W.3d 61, 71 (Tex.App.--Fort Worth 2010, pet. ref'd), *citing Bell v. State*, 620 S.W.2d 116, 126 (Tex.Crim.App. 1980); *Jones v. State*, 119 S.W.3d

6

412, 421 (Tex.App.--Fort Worth 2003, no pet.).

Courts have held evidence of an extraneous offense proper in sexual assault cases to rebut a defensive theory of fabrication or that the defendant is being framed by the complainant. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex.Crim.App. 2008). In *Bass*, the Court of Criminal Appeals noted that "[t]he issue does not necessarily turn on the type of defense presented, but on whether the extraneous-offense evidence has noncharacter-conformity relevance by, for example, rebutting a defensive theory or making less probable defensive evidence that undermines an elemental fact." *See id*. at n.8. To be admissible for rebuttal of a fabrication or "frame-up" defense, "the extraneous misconduct must be at least similar to the charged one . . . ." *Wheeler v. State*, 67 S.W.3d 879, 887 n.22 (Tex.Crim.App. 2002); *see generally Bass*, 270 S.W.3d at 562-63. The degree of similarity required for admissibility is not "one of exacting sameness" as is required when extraneous offense testimony is used to prove a "defendant's system." *See Dennis v. State*, 178 S.W.3d 172, 179 (Tex.App.--Houston [1st Dist.] 2005, pet. ref'd).

During opening statements, counsel for McMorris told the jury that McMorris and Rodriguez had engaged in consensual sex. Counsel asserted that Rodriguez fabricated a claim of sexual assault in order to get money from McMorris, based on the fact that she contacted a civil attorney after the alleged assault. He continued his theory by telling the jury that Rodriguez believed that McMorris had a lot of money and that "she could get a piece of the pie . . . ."

On cross-examination, counsel for McMorris asked Rodriguez whether she had heard rumors that McMorris had given money to other employees and dated another employee. Counsel also asked her about visiting and retaining a civil attorney seven days after the offense; stated "[Y]ou wanted money from Mr. McMorris, correct?;" and asked a number of questions

designed to make it appear as though Rodriguez had lied about being sexually assaulted. Counsel also asked Jessica Hinojosa whether McMorris had ever made sexual advances towards her or had ever bothered her when he was alone with her at work; whether Hinojosa ever saw McMorris make sexual advances or be flirtatious with other female employees; and whether any other female employees had ever told Hinojosa that McMorris was making sexual advances or being flirtatious.

McMorris testified that he saw Rodriguez in her apartment complex's parking lot where, after picking up dinner from another apartment in the complex, he motioned to Rodriguez, who followed him to another parking lot, where they engaged in consensual sex in McMorris's vehicle. He testified that he went into the restroom at work to talk to Rodriguez about filling and changing the soap and paper towel dispensers, and denied committing any of the acts alleged by Rodriguez. On cross-examination, McMorris denied knowing that Rodriguez, or any of his employees, were illegal immigrants.

After the defense rested its case-in-chief, the State informed the trial court that it intended to call Luna as a rebuttal witness in order to present evidence of two extraneous offenses. The State made the following proffer:

> Basically, Your Honor, what Ms. Luna is going to testify to, the first extraneous offense will be that what the Defendant testified to today, that he did not know any of his workers were illegal immigrants and did not know that they did not have papers. She will testify to the fact that the Defendant told her, one, to get her sister's papers because she was illegal. So he had knowledge of the fact that she was illegal.
>     Number two, Ms. Luna had an ongoing relationship with the Defendant. She was pregnant with his child, and there were times when he would sexually assault her. So we would like to go into those specific sexual assaults.

McMorris objected, and after hearing the arguments of parties, the trial court overruled

8

McMorris's objection.[2]

Luna testified that she had worked for McMorris at American Eurocoptor, and that he knew she was in the country illegally. McMorris instructed her to use her sister's Social Security information so Luna would be permitted to work. She testified that from the time she began working there, McMorris made advances towards her. On one occasion, McMorris touched her leg and thigh, and Luna told him it was inappropriate because he was her boss. On "several" occasions, McMorris took photographs of her "back part," which she did not feel was appropriate. There were occasions where McMorris would make sexual advances on Luna while she cleaned the restroom. Luna testified that "he would close the door, and he would say that Little Jimmie would wake up when I was close to him." She explained that "Little Jimmie" referred to McMorris's penis and that McMorris wanted her to touch his penis. Luna and McMorris began dating about six months after he began making these advances and maintained a good relationship from the end of 2007 until May 2010.

Luna responded affirmatively when the State asked "[w]as there ever a time when - when you were pregnant when Jimmie forced you to have sex with him when you didn't want to?" Luna gave the following testimony about the times McMorris forced himself on her:

Q.     [Prosecutor] About how many times would you say, if you can remember, Jimmie forced you to have sex with him?

A.     [Luna] About five times.

Q.     I'm not trying to be too graphic, but could you please tell the jury about these times, if you remember.

A.     Yes. He would come at night, and he would tell me that he wanted to be

---

[2] Counsel for McMorris requested a limiting instruction, and the trial court informed counsel what the instruction would be and that the court would give the instruction when requested, however McMorris never made such a request during Luna's testimony.

with me, and I would tell him no, because I was hurting.   He never did obey that --

[Objection by McMorris regarding lack of notice overruled]

Q.      [Prosecutor] Araceli, if you could - did you tell Jimmie no during these times?

A.      No.

Q.      Did you - during these times, did you want to have - during these times that he forced himself on you, did you want to have sex with him?

A.      No.

Q.      Okay.   Now, Araceli, then how did he force himself on you?

A.      He would just use his strength, and he would get on top of me, and naturally he's stronger than I am.

Q.      When - did this happen at your apartment?

A.      Yes.

Q.      Did you let him into the apartment, or did he force his way in?

A.      He had a key.   But at one occasion, I put a chain that all the apartments have, and he broke it and came in.

McMorris's defensive theory at trial was:   (1) that Rodriguez fabricated the sexual assault in an attempt to obtain money from McMorris; (2) that McMorris and Rodriguez engaged in consensual sex; and (3) that McMorris was not the kind of person to make advances on female employees at work.   Luna's testimony about McMorris's sexual advances toward her, specifically in the restroom at American Eurocoptor while she was employed by JMAC, tended to rebut McMorris's defensive theory of fabrication and that he was not the type of person to make such advances.   *See Bass*, 270 S.W.3d at 562-63; *Daggett v. State*, 187 S.W. 3d 444, 453-54 (Tex.Crim.App. 2005); *Wheeler*, 67 S.W.3d at 887-88.

10

Furthermore, the circumstances of McMorris's sexual advances against Luna were sufficiently similar to those in the charged sexual assault against Rodriguez thereby rendering the extraneous offenses admissible. *Dennis*, 178 S.W.3d at 179. Both Luna and Rodriguez worked for McMorris's cleaning business at the American Eurocoptor facilities; both were illegal immigrants; and McMorris made unwanted sexual advances toward both women in a bathroom. All of this evidence was within the zone of reasonable disagreement, and was admissible for the noncharacter-conformity purpose of rebutting McMorris's defensive theories. We perceive no abuse of discretion. McMorris's first issue is overruled.

### *Allen* Charge

Next, McMorris argues that the trial court erred by delivering a supplemental *Allen* charge to the jury which "coerced" a verdict. He also asserts that the trial court erred by denying his motion for mistrial, which was based on the supplemental instruction. The State argues that McMorris forfeited his complaints regarding the alleged coercive nature of the *Allen* charge by failing to timely object at trial and, in the alternative, that the language of the trial court's *Allen* charge was not coercive.

While courts have sanctioned the use of an *Allen* charge when a jury indicates that it is deadlocked, *see Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896); *Howard v. State*, 941 S.W.2d 102, 123 (Tex.Crim.App. 1996), a trial court errs if it delivers an *Allen* charge which has a coercive effect on jury deliberations. *See Howard*, 941 S.W.2d at 123.

Here, the jury began its deliberations at 4:37 p.m. on April 7, 2011, and recessed that evening at 6:05 p.m. Deliberations resumed the next morning at 8:34 a.m. At 11:15 a.m., the jury sent out a note stating "[w]e the jury cannot come to a consensus in this case. The vote stands

11

as of now 10-2." The trial court instructed the jury to continue its deliberations. At 3 p.m., the

jury sent out jury note number seven, stating "[w]e are still not in concurrence." Following an

exchange between counsels for both parties and the court where the language of the proposed *Allen*

charge was discussed, the trial court gave the jury the following supplemental instruction, to which

McMorris objected:

> 'Members of the jury, you are instructed that in a large proportion of cases,
> absolute certainty cannot be expected. Although the verdict must be the verdict of
> each individual juror and not a mere acquiescence in the conclusion of other jurors,
> each juror should show a proper regard for the opinions of the other jurors. You
> should listen with a disposition of being convinced to the arguments of the other
> jurors. If a large number of jurors are for deciding the case in one way, those in the
> minority should consider whether they are basing their opinion on speculation or
> guesswork and not on the evidence in the case.
> If this jury finds itself unable to arrive at a unanimous verdict, it will be
> necessary for the Court to declare a mistrial and discharge the jury. The
> indictment will still be pending, and it is reasonable to assume that the case will be
> tried again before another jury at some future time. Any such future jury will be
> empaneled in the same way this jury has been empaneled and will likely hear the
> same evidence which has been presented to this jury. The questions to be
> determined by that jury will be the same questions confronting you, and there is no
> reason to hope that the next jury will find these questions any easier to decide than
> you have found them.
> With this additional instruction, you are instructed to continue deliberations
> in an effort to arrive at a verdict that's acceptable to all members of the jury, if you
> can do so without doing violence to your conscience.'

The jury resumed its deliberations at 3:42 p.m., and at 4:56 p.m., McMorris moved for a

mistrial based on the length of time the jury had been deliberating. The trial court denied

McMorris's motion.

McMorris argues that the last sentence of the first paragraph of the *Allen* charge was

improper: "[i]f a large number of jurors are for deciding the case in one way, those in the

minority should consider whether they are basing their opinion on speculation or guesswork and

not on the evidence in the case." McMorris argues that this language impermissibly coerced a

12

verdict and is a constitutional violation of his right to due process and a fair trial.

The challenged language of the *Allen* charge is identical to the language challenged in *West v. State*, 121 S.W.3d 95,108 (Tex.App.--Fort Worth 2003, pet. ref'd). In fact, the entire first paragraph is identical in both cases. *West*, 121 S.W.3d at 108. *West* held that "[t]he instructions contained in the *Allen* charge utilized here are consistent with similar instructions used in *Allen* charges used throughout this state and have been held to be noncoercive." *Id.* at 109. The court noted that:

> West does not point to any specific language that he contends was coercive, and after reviewing the instruction, we see no language that shows jury coercion likely occurred. Specifically, the *Allen* charge given here does not tell the jury that one side or the other possesses the superior judgment, nor does it tell them to distrust their judgment. Additionally, the trial court carefully concluded the *Allen* charge by instructing the jury that, in any event, it should try to arrive at a verdict acceptable to all jurors only if it could do so 'without doing violence to your conscience.'

*Id.* at 109.

The *Allen* charge in this case is supported by the trial court's instruction to the jury that "you are instructed to continue deliberations in an effort to arrive at a verdict that's acceptable to all members of the jury, if you can do so without doing violence to your conscience." We find no reason to depart from precedent in this case, and find no error in the *Allen* charge. Because the trial court did not err when it gave the *Allen* charge, McMorris's argument that the court erred in denying his motion for a mistrial based on the charge is without merit. McMorris's second issue is overruled.

**Denial of Motion for New Trial**

McMorris's final issue is that the trial court abused its discretion by denying his Motion for

New Trial.[3]  The State argues that McMorris forfeited his challenge by failing to attack each independent basis supporting the trial court's ruling and, alternatively, that the court did not abuse its discretion in denying the motion for new trial because the juror's affidavit and letter were not competent evidence under Rule 606(b) of the Texas Rules of Evidence.

We review a trial court's denial of a motion for new trial for an abuse of discretion.  *Webb v. State*, 232 S.W.3d 109, 112 (Tex.Crim.App. 2007).  This Court views the evidence in the light most favorable to the trial court's ruling and will uphold the ruling if it was within the zone of reasonable disagreement.  *Id.*  We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable.  *Id.*  Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.  *Id.*, *citing Charles v. State*, 146 S.W.3d 204, 208 (Tex.Crim.App. 2004).

Texas Rule of Evidence Rule 606(b) states that a juror may not testify or make an affidavit about any matter or statement occurring during deliberations or the effects of anything on any juror's mind as influencing the verdict with two exceptions:  (1) "whether any outside influence was improperly brought to bear upon any juror," or (2) "to rebut a claim that the juror was not qualified to serve."  "[D]efense counsel has an obligation to ask questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial and truthful.

---

[3] McMorris did not direct this Court to substantial authority supporting his argument, other than citing a case for the standard of review, the Sixth Amendment, and TEX.CODE CRIM.PROC.ANN. arts. 35.15 and 35.16 (West 2006). Texas Rule of Appellate Procedure 38.1(i) states that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."  TEX.R.APP.P. 38.1(i). Furthermore, as a general rule, an appellate court will not consider an issue raised by an appellant where the appellant fails to provide any legal argument to support his claim.  *See Hamilton v. Williams*, 298 S.W.3d 334, 337 (Tex.App.--Fort Worth 2009, pet. denied).  This is so because an issue unsupported by citation to any legal authority presents nothing for the court to review.  *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 525 (Tex.App.--Fort Worth 2009, no pet.).  While McMorris did not provide this Court with any legal authority in support of his argument, he did provide citations to the record, and in the interest of justice we consider his argument.

Unless defense counsel asks such questions, the material information which a juror fails to disclose is not really 'withheld.'" *Armstrong v. State*, 897 S.W.2d 361, 363-64 (Tex.Crim.App. 1995)[Internal citation omitted]. In *Armstrong*, the county attorney personally prosecuted a murder case. *See id*. at 362. The jury foreperson had been friends with the county attorney for over twenty-five years. In addition, the foreperson's husband and the county attorney had been each other's best man at their respective weddings and the husband was serving as the county attorney's campaign treasurer during the trial, having already served in that capacity in a previous campaign. *Id*. at 363. The foreperson did not reveal any of this information during voir dire. *Id*. at 362-63. The prospective jurors were asked whether any of them were "so well acquainted with" or "acquainted or associated with" the prosecution staff that it would affect their verdict. *Id*. at 362. They were also asked whether they had "any special connection with the County Attorney's office, perhaps a close friend in the office, secretary, investigator or the like" and whether there was anything they could think of that touched on their qualifications to serve on the case. *Id*. at 362-63. The Court of Criminal Appeals held that there was no juror misconduct because the jury panel was not asked "the questions needed to elicit the desired information." *Id*. at 364.

Here, after the conclusion of the trial, juror C.F. submitted a letter to the trial court, the District Attorney, and the trial prosecutors stating:

> Judge, I do recall you saying outside things should not be discussed while deliberating and we all should focus on the case. I remember before the jury was selected the question was asked if you or any family member was ever raped or sexually assaulted. During deliberation one of the jurors said she was raped/sexually assaulted by a guy in [sic] which she was introduced by close friends of hers. She stated she did not want to mention it when asked by the attorney's [sic]. I can't remember her name but I do remember her face. **(Small thin petite lady, salt/pepper hair, long pony tail with glasses)** She went on to

15

tell the entire story how he sexually assaulted her.   She also mentioned other stories that had nothing to do with this case.   When questions were asked she would always have a story to tell.   Another juror informed her on numerous occasions that she should not be discussing outside stories.   I am not sure if the things/stories told by her influenced/swayed the jurors one way or another but I feel everyone should have a fair trial . . . I believe it's my duty and responsibility to tell the truth and inform you of jury misconduct during deliberations.   [Emphasis in original].

McMorris filed a Motion for New Trial and a hearing was held on June 23, 2011.

McMorris called juror C.F. to testify but she did not appear due to a family emergency.   McMorris offered the letter and an affidavit signed by juror C.F. as evidence.   The State made no objection to the admission of either the affidavit or the letter.   No other evidence was presented by McMorris, and the State offered no evidence.   During argument, the State raised a Rule 606(b) challenge.[4]   Following the arguments, the trial court denied the motion for new trial.   In its oral ruling, the trial court specifically found that:

[T]he State's reliance on 606 regarding one juror saying what another juror said in voir dire is well founded, and the Court does not see how it could ever consider that evidence absent an allegation of outside influence which has not been raised in this case.

The trial court noted that the questions asked of the jury by counsel during voir dire were "somewhat vague" as to whether any member of the venire had been personally sexually assaulted, and that the proper question would be something along the line of "[i]s there someone here who is a victim of sexual assault themselves," or perhaps even a more specific question such that the members of the venire would understand that counsel was inquiring about their personal experiences.[5]   The trial court noted that there was no evidence of which juror may have caused the

---

[4] No objections were made to the letter or the affidavit.   Accordingly, the testimony and affidavits are available for our consideration in determining whether reversible error occurred.   *See Salazar v. State*, 38 S.W.3d 141, 147-48 (Tex.Crim.App. 2001).

[5] The trial court determined that counsel's question "[d]oes anyone know someone who's been sexually assaulted"

16

alleged misconduct, as both McMorris and the State suggested it was a different juror. The trial court found that McMorris did not utilize due diligence in voir dire by asking the questions that the defense felt needed to be answered in accordance with *White v. State*, 225 S.W.3d 571, 575-76 (Tex.Crim.App. 2007).

We do not address the arguments that McMorris forfeited his right to challenge the trial court's ruling that the evidence presented is not competent evidence under Rule 606(b), or that McMorris did not exercise due diligence in voir dire, as we find no error in the trial court's decision. The Supreme Court of Texas has held that "while failure to disclose bias is a form of juror misconduct that justifies a new trial under the appropriate circumstances, proof of a juror's failure to disclose bias must come from some source other than a fellow juror's testimony about deliberations." *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 371 (Tex.2000). In the instant case, the only evidence presented was an affidavit and a letter, neither of which identified which juror failed to disclose material information. As such, McMorris presented no evidence to establish proof of a juror's failure to disclose bias from a source other than a fellow juror's testimony, and therefore McMorris cannot prove that misconduct occurred. *Golden Eagle Archery, Inc.*, 24 S.W.3d at 372. The trial court did not abuse its discretion in denying the motion for new trial. McMorris's final issue is overruled.

## CONCLUSION

---

was "somewhat vague." During voir dire, after a prospective juror told of her own experience of having been sexually assaulted, the State asked "I know that [venireperson K] has shared an experience with us. Is there anyone else here that knows someone who was sexually assaulted?" When another member of the venire indicated that they knew someone who had been sexually assaulted, the State followed up with "[y]ou knew someone that was sexually assaulted?" Following additional questions, the State asked the panel: "Anybody else know somebody that was sexually assaulted?;" "Anybody else know somebody that was accused or know a victim of sexual assault? I'll expand the question;" [to a venriperson] "You know someone that was sexually assaulted or accused?;" "Anybody over here know someone that's been sexually assaulted or accused?" Neither party ever specifically inquired of the venire as to whether they had personally been the victim of a sexual assault.

Having overruled each of McMorris's issues, the judgment of the trial court is affirmed.


December 19, 2012

                                CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)

18